UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

FRANCES O'LEARY,

                   Plaintiff,

    -against-

NY STATE UNIFED COURT SYSTEM,

                   Defendant.

-----------------------------------------------------X

05 Civ. 6722 (HB)

AFFIDAVIT OF EDEN
<u>FITZGIBBONS MAURO</u>

STATE OF NEW YORK  )
                :
COUNTY OF NASSAU  )

    Eden Fitzgibbons Mauro, being duly sworn, deposes and says:

    1. I am partner in the firm, Mauro & Guzzardo, LLP, attorneys of record for the Plaintiff. I submit this affidavit in opposition to defendant's motion for summary judgment. The facts set forth in this affidavit are based upon review of documents and conversations with the Plaintiff herein.

<u>Procedural History</u>

    2.    On May 5, 2004, the Plaintiff filed a complaint of discrimination with the New York State Unified Court System Office of the Inspector General. Exhibit "A" hereto. Said complaint alleged race, color, national origin, sex, age and education discrimination. Exhibit "A".

    3.    On July 19, 2004, Plaintiff filed a Charge of Discrimination with the EEOC alleging she had been discriminated against by Defendant. Exhibit "1" to Sullivan Affidavit.

4.    On July 26, 2005, Plaintiff filed the original Complaint in this action. Exhibit "2" to Sullivan Affidavit.

5.    On or about September 20, 2005, Defendant served its Answer to the Original Complaint.  Exhibit "B" hereto.

6.    On July 19, 2006, Plaintiff filed her second Charge of Discrimination against Defendant with the EEOC.  Exhibit "3" to Sullivan Affidavit.

7.    On November 13, 2006, Plaintiff filed an Amended Complaint. Exhibit "4" to Sullivan Affidavit.

8.    Plaintiff's Deposition was held on September 7, 2006.  Relevant portions of the deposition transcript are annexed hereto as Exhibit "C".

Promotions sought

9.    The Affidavit of John Sullivan sets forth the majority of the promotions which are the subject of this lawsuit.  In order to avoid repetition, only issues not covered by the Sullivan Affidavit are discussed herein.

10.    In December 2002, Plaintiff applied for the position of Deputy Chief Clerk V.  Exhibit "C" and Exhibit "D" hereto.

11.    The Deputy Chief Clerk V position was given to Serena Springle. Exhibit "C".

12.    Serena Springle's resume indicates that, at the time of appointment, she only possessed a high school diploma.  Exhibit "E" hereto.

13.    In November 2004, Plaintiff applied for the Chief Clerk of the Bronx County Surrogate's Court position.  Affidavit of John Sullivan, par. 69.  Plaintiff was not granted an interview.  Affidavit of John Sullivan, par. 71.

14.    Angel Cruz and John Raniolo were both granted an interview. Affidavit of John Sullivan, par. 71 and exhibit 23 thereto.

15.    John Raniolo was listed as the number two (2) preference of all candidates.  Exhibit "F" hereto.

16.    Annexed herewith are copies of an Affidavit of Frances O'Leary and and Affidavit of Michael Cusack.

**WHEREFORE,** it is respectfully requested that Defendant's motion for summary judgment be denied in all respects.

_____
Eden Fitzgibbons Mauro

Sworn to before me this
30th day of April, 2007

_____
Notary Public

Deborah Gale, Notary
State of New York
County of Suffolk
No. 01GA  4669066
Commission expires August 3, 2010

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

FRANCES O'LEARY,

                       Plaintiff,

    -against-

NY STATE UNIFED COURT SYSTEM,

                     Defendant.

-----------------------------------------------------X

05 Civ. 6722 (HB)

PLAITNIFF'S AFFIDAVIT
IN OPPOSITION TO
DEFENDANT'S MOTION
<u>FOR SUMMARY JUDGMENT</u>

STATE OF NEW YORK  )
                 : ss.:
COUNTY OF NASSAU  )

      FRANCES O'LEARY, being duly sworn, deposes and says:

    1. I am the Plaintiff herein and I make this Affidavit in opposition to Defendant's Motion for Summary Judgment.

    2. I am a Caucasian female.

    3. I have been employed by the Unified Court System for the past twenty nine (29) years as, <u>inter</u> <u>alia</u>, a Uniformed Court Officer, Senior Court Clerk and Principle Court Attorney.

    4. During the my tenure with the Unified Court System, I have continued to attend seminars and conferences in specialized areas of law: For example for the past six (6) years I have attended the R.C. Diocese of Brooklyn, Annual Lawyers' Conference, at which Surrogate Holzman lectures. The subject of these conferences is trusts and estates. This is in addition to the annual January CLE's (12 credits annually) provided by Unified Court System for their staff.

5. In or about 2003, I became certified as a Court Examiner under the Guardianship Rules (Rule 36).

6. On May 28, 2004, I submitted a formal complaint of discriminatory treatment with the New York State Unified Court System Office of Inspector General. I complained of discrimination in promotions on account of race, color, national origin, sex and age. A copy of the Complaint is annexed hereto as exhibit "1".

7. On or about July 19, 2004, I filed my first Charge of Discrimination with the EEOC alleging discrimination in promotions. Exhibit 1 to Defendant's Rule 56.1 Statement.

8. On or about July 26, 2005, I filed my complaint of discrimination, alleging, inter alia, failure to promote base upon race, ethnicity, national origin and gender, in the Southern District of New York. Exhibit 2 to Defendant's Rule 56.1 Statement.

9. Thereafter, in December 2005, while working for J. Sackett, Bronx County, I was given a letter of termination.

10. In or about December 2005, I interviewed for a position with J. Caesar Cirigliano, a Court of Claims Judge. During the course of the interview, J. Cirigliano asked me why I wanted to work for a judge who only had one (1) year left before mandatory retirement. I responded that the one (1) year working for him would give me time to pursue other positions within the Court System. I further advised him that I had filed a claim of discrimination with both the Inspector General's office and the EEOC and had filed a complaint in Federal

Court.  J. Cirigliano responded that he did not want to know about my lawsuit.  I was thereafter denied the position.

11. On or about January 31, 2006, I was called into a meeting with J. Salmon, Administrative Justice for the Civil Term.  During the course of that meeting, J. Salmon informed me that he would place me in the law pool on the condition that I do him a "favor".  When I asked what the favor was, he responded, that I "had a reputation of embarrassing people" and that he did not want me to "embarrass" him.  I asked if he was referring to my claims of discrimination, and he responded that he didn't want to hear about it.  Because I needed the job, I agreed not to "embarrass" him.

12. However, when I joined the Law Department, my position title was changed, without my consent, to Court Attorney, a position covered by the union.  As a result of losing my title I lost income as a result of this change because I had to pay union dues, I am subject to compulsory donation of annual leave time and I no longer received the same level of dental and optical benefits.

**WHEREFORE,** it is respectfully requested that Defendant's motion for summary judgment be denied in all respects.

_____
Frances O'Leary

Sworn to before me this
day of April, 2007

_____
Notary Public

Deborah Gale, Notary
State of New York
County of Suffolk
No. 01GA 4888888
Commission expires August 3, 2010

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

FRANCES O'LEARY,

                      Plaintiff,

    -against-

NY STATE UNIFED COURT SYSTEM,

                    Defendant.

------------------------------------------------------X

05 Civ. 6722 (HB)

AFFIDAVIT OF
MICHAEL CUSACK

STATE OF NEW YORK  )
                    : ss.:
COUNTY OF NASSAU  )

      MICHAEL CUSACK, being duly sworn, deposes and says:

    1.  I worked within the Unified Court System for over twenty nine (29) years as, inter alia, a Uniformed Court Officer, Assistant Court Clerk, Senior Court Clerk and Deputy Chief Clerk V.

    2.  Over the past twenty nine (29) years, in my various positions with the Unified Court System, I have come to know Frances O'Leary and I am familiar with her work experience and work performance as a Court Clerk and a Court Attorney.

    3.  As part of my job responsibilities as a Deputy Chief Clerk V, I sat on various panels designed to review resumes for interviews, conduct interviews and ultimately recommend a candidate to fill Clerk positions within the Unified Court System.

4. Having sat on panels and having worked as a Deputy Chief Clerk V for over fifteen (15) years, I am fully familiar with the job requirements for each position.

5. Had Fran's resume come before me, I would have unequivocally recommended her for an interview for a Chief Clerk V, Chief Clerk VI or Chief Clerk VII position. Based upon her education and job experience she is fully qualified for the each of these positions.

Michael Cusack

Sworn to before me this
27th  day of April, 2007

Notary Public
JOHN P. MAURO, ESQ
Notary Public State of New York
No. 02MA6002073
Qualified in Suffolk County
Commission Expires March 11, 2010

2

# New York State Unified Court System Office of the Inspector General

UCS-18 (8/02)

THE SPE...

## CLAIM OF DISCRIMINATORY TREATMENT

Please complete this form to file a claim of discriminatory treatment with the Unified Court System's Office of the Inspector General. Any individuals contacted by the Office of the Inspector General will be asked not to disclose the facts or contents of your claim unless disclosure is necessary.

Name: FRANCES O'LEARY.                          RECEIVED

Title: PRINCIPLE CT ATTORNEY TO JUSTICE

Work Location: BX SUP.    851 GRAND CONCOURSE

City: BX          State: NY    Zip: 10451.    Work Phone: (78) 590-8932

Home Address:  23 07 GARSILL AV

City: BX          State: NY    Zip: 10469.    Home Phone: (78) 881-7013

Following receipt of your claim, you will be advised of the name and telephone number of the staff member responsible for investigating your claim. You also will be informed if the office needs further information or if there is a reason why the office cannot proceed with the investigation.

**1. I believe that I have been treated in a discriminatory manner based on my:**

- [x] Race
- [x] Color
- [ ] Creed
- [ ] Religion
- [x] National Origin
- [ ] Sexual Orientation
- [x] Sex (including Sexual Harassment)
- [x] Age
- [ ] Disability
- [ ] Marital Status
- [ ] Other (please specify): EDUCATION

'04 MAY 28 P12:2...
RECEIVED
THE SPE...

**2. I believe that the act or treatment described below is discriminatory:**

Failure to afford me an Interview for the title of Chief Clerk, Civil Division, Bx Sup.

**3. I believe that the following individual(s) has (have) acted in a discriminatory manner:**

Herald Esposito, Administrative Justice Civil Term Sup Ct.

**4. Date of act or treatment (or indicate if ongoing):**

Ongoing. See documents submitted to & forwarded by Justice, Diversity Director, Alice Wagner, this date.

**5. Witnesses (include names, work locations and telephone numbers):**

See documents submitted by his Attorney as indicated above.

I authorize the New York State Unified Court System's Office of the Inspector General to use my name in investigating this claim.

Signature: Frances O'Leary          Date: 5/28/04

Please attach any additional information you may have about the claim and mail this form or a copy of it to:

**Office of the Inspector General**
**Office of Court Administration**
**25 Beaver Street**
**Attention: Managing Inspector General for Bias Matters**
**New York, New York 10004**
**(646) 386-3507**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRANCES O'LEARY,

                    Plaintiff                          ANSWER

          - against -                                  05 CV 6722 (HB)

NY STATE UNIFIED COURT SYSTEM,

                    Defendant.

---

Defendant, by its attorney, Michael Colodner, answering the Complaint herein:

1.     Denies the allegations contained in paragraph "1" of the Complaint, except admits that plaintiff purports to bring this action on the grounds enumerated therein.

2.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "2" of the Complaint.

3.     Denies the allegations contained in paragraph "3" of the Complaint, except admits that the Office of Court Administration has offices at 25 Beaver Street, New York, New York.

4.     Denies the allegations contained in paragraph "4" of the Complaint, except admits that the Unified Court System of the State of New York employs more than 15 persons.

5.    Denies the allegations contained in paragraph "5" of the Complaint, except admits that at all times relevant to this action plaintiff was an employee of the Unified Court System of the State of New York.

6.    Admits the allegations contained in paragraph "6" of the Complaint.

7.    Denies the allegations contained in paragraph "7" of the Complaint, and refers to the statutory provision referred to therein for its contents.

8.    Denies the allegations contained in paragraph "8" of the Complaint, except admits that venue is properly in the Southern District of New York.

9.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "9" of the Complaint.

10.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "10" of the Complaint, except admits that plaintiff's current title is Principal Law Clerk to Judge and she is assigned in that capacity to a Justice of the Supreme Court, Bronx County.

11.    Denies the allegations contained in paragraphs "11" through and including "23" of the Complaint.

12.    Denies the allegations contained in paragraph "24" of the Complaint, except refers to the response to plaintiff's Charge of Discrimination that was submitted to the Equal Employment Opportunity Commission on behalf of the Unified Court System of the State of New York for the contents thereof.

2

13.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "25" of the Complaint, except admits that plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

14.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "26" of the Complaint, except admits that the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights letter to plaintiff dated April 29, 2005.

15.    As and for an answer to paragraph "27" of the Complaint, repeats and realleges paragraphs "1" through "14" of this Answer.

16.    Denies the allegations contained in paragraph "28" of the Complaint.

17.    As and for an answer to paragraph "29" of the Complaint, repeats and realleges paragraphs "1" through "16" of this Answer.

18.    Denies the allegations contained in paragraph "30" of the Complaint.

19.    As and for an answer to paragraph "31" of the Complaint, repeats and realleges paragraphs "1" through "18" of this Answer.

20.    Denies the allegations contained in paragraph "32" of the Complaint.

21.    Alleges that paragraph "33" of the Complaint makes no allegations to which a response is required.

3

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

22.    Plaintiff has failed to state a cause of action upon which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

23.    This Court lacks subject matter jurisdiction over plaintiff's causes of action.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

24.    This action is barred in whole or in part by the statute of limitations.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

25.    Defendant is immune from suit pursuant to the Eleventh Amendment of the United States Constitution and the doctrine of sovereign immunity.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

26.    Defendant is not subject to liability under the Administrative Code of the City of New York.

WHEREFORE, the Complaint should be dismissed.

Dated:      Albany, New York
            September 20, 2005

                                    MICHAEL COLODNER
                                    Attorney for Defendant
                                    Office of Court Administration
                                    Empire State Plaza
                                    4 ESP, Suite 2001
                                    Albany, New York  12223-1450
                                    (518) 474-7469
                                    By:


                                    John J. Sullivan (JJS9947)
                                    Assistant Deputy Counsel

5

20

O'LEARY

1

2    A.    To aid people seeking to pursue

3    a matter themselves without the benefit of

4    an attorney.

5         MR. COREN:  Before the next

6    question.

7         (The witness and her counsel

8    conferred off the record.)

9    A.    In the Central Clerk's office

10   and Surrogate's --

11        MR. COREN:  Do you want to add

12   to your answer that you previously gave?

13        THE WITNESS:  Yes.

14   Q.    Please do.

15   A.    When I was assigned to the

16   Central Clerk's office in the Surrogate's

17   office, I did supervise people in that

18   office.

19   Q.    Who did you supervise?

20   A.    The court aides -- I am not sure

21   of the titles of the people that I

22   supervised there, but I know they were

23   unrated clerks.

24   Q.    And how did you supervise?

25   A.    I'm not sure I understand your

21

                         O'LEARY

1

2    question.

3        Q.    You said you supervised them.

4    How did you supervise them.  What did you

5    supervise them about?

6        A.    In the performance of their

7    duties.

8        Q.    Which were what?

9        A.    Getting the correct documents to

10   copy and to certify, I did the

11   certification.

12       Q.    So with respect to that, you

13   would tell a court aide to go and fetch

14   the will from the file and bring it to you

15   and make a copy?

16       A.    From the vault.

17       Q.    From the vault and make a copy.

18   Would you make a copy or the court aide

19   would make the copies?

20       A.    They would make the copies.

21       Q.    And they would bring you the

22   will and the copies together and then you

23   would certify them?

24       A.    Yes.

25       Q.    And that's what you mean by

22

O'LEARY

1

2  supervising them?

3      A.    It's not limited to that, but

4  yes.

5      Q.    What else did you do to

6  supervise them?

7      A.    Direct them in answering

8  information that came from the public.  I

9  don't recall other things, but I know when

10  I was there, I was there as their

11  supervisor.

12      Q.    And you were assigned, that was

13  your role, to supervise the court aides

14  when you were there?

15      A.    Yes.

16      Q.    And you don't recall what else

17  you supervised them doing?

18      A.    Not really.

19      Q.    When you say that you interacted

20  with the court aides with respect to

21  inquiries from the public, is that

22  correct?

23      A.    Yes.

24      Q.    So did you deal directly with

25  the public or did the court aides?

23

O'LEARY

1

2      A.      They could generally refer the

3   person to me, but sometimes I would have

4   them escort them to a particular office,

5   direct them to a particular agency.

6      Q.      You would tell the aide to tell

7   them where to go?

8      A.      Ask them to direct them, yes.

9      Q.      Did you prepare any performance

10   evaluations for the aides?

11      A.      No.

12      Q.      Did you monitor their time?

13      A.      I would make sure they took an

14   hour for lunch, but other than that, no.

15      Q.      Going back to the Surrogate

16   Court for a minute, when you were in the

17   administration department, did you

18   supervise anybody there?

19      A.      I believe there was an unrated

20   clerk there.

21      Q.      What was the nature of you

22   supervising the duties of that unrated

23   clerk, if you recall?

24      A.      I don't.

25      Q.      What about in the courtroom, did

67

O'LEARY

1

2  cut at that point had been more than I

3  anticipated, and in Criminal Court I ran

4  into a stretch where there was nothing to

5  do.  And so the opportunity came up,

6  Justice Bernheim asked me if I would go to

7  work for her and I jumped at it.

8      Q.    Did anyone help you get that job

9  with Justice Bernheim?

10     A.    No.

11     Q.    Did she advertise for that

12 position?

13     A.    No.

14     Q.    She just came to you and said I

15 have an opening, would you like to fill

16 it?

17     A.    Yes.

18     Q.    And you worked as a principal

19 court attorney with Justice Bernheim, is

20 that correct?

21     A.    Correct.

22     Q.    As the principal court attorney,

23 were your duties other than legal

24 research?

25     A.    She was a fully elected Justice,

68

1                          O'LEARY
2     she did have a staff and she did have
3     projects.  So I supervised the
4     confidential.
5                    MS. TIMON:  When you say
6     confidential, what do you mean?  Who is
7     that?
8                    THE WITNESS:  As a Justice, she
9     is entitled to a personal secretary, a
10    confidential secretary.  The confidential
11    secretary at that time was 18 years old.
12    We had -- I supervised her time and leave,
13    I supervised as we updated books. The
14    Judge had a couple of projects going on
15    that we would help her with from time to
16    time.
17         Q.    What was her name, the person
18    you supervised?
19         A.    Carmen Watkins.
20         Q.    Did you sign her time sheets?
21         A.    Again, I initialed them for the
22    Judge, but I did not sign off on them.
23         Q.    Was there anybody else that you
24    supervised besides the Judge's secretary?
25                    THE WITNESS:  One moment.

69

O'LEARY

1

2          MR. COREN:  Counsel?

3          MR. SULLIVAN:  Let the record

4   reflect that the witness is conferring

5   with her attorney before answering the

6   question.

7          MR. COREN:  She's ready to

8   answer.

9      A.    I want to amend my answer as to

10  Judge Boyle, and it would also apply to

11  Judge Savarese, but not to Judge Monahan.

12  Judge Savarese and Judge Boyle, and I

13  believe Judge Griffin, but that I am not

14  positive of, each had student interns, and

15  I did supervise them, assigned them work,

16  reviewed their work, gave them projects.

17  I know Bernheim did not abide by interns.

18      Q.    So was there anyone else that

19  you did supervise when you were a

20  principal clerk to Judge Bernheim?

21      A.    No.

22      Q.    And how did it come to be that

23  you left working for Judge Bernheim after

24  a year?

25      A.    She reached 70 within that year,

70

                    O'LEARY

1

2    chose not to seek certification, and

3    retired.

4        Q.    How did you come to your next

5    job with Judge Ruiz?

6        A.    I was recommended to Judge Ruiz.

7        Q.    By whom?

8        A.    Several people within the court

9    system.

10       Q.    Who were they?

11       A.    The woman who is now Justice

12   Manzanet among others.  I had dropped off

13   a resume to her, was interviewed and

14   hired.

15       Q.    You dropped off a resume to

16   Judge Ruiz?

17       A.    Correct.

18       Q.    Who was the other person besides

19   Judge Manzanet, which could you spell for

20   the record, take a shot at spelling.

21       A.    M-a-n-z-a-n-e-t.  Besides Judge

22   Manzanet, probably Justice Boyle, Judge

23   Bernheim, Judge Price.  I don't know who

24   else.

25       Q.    Did you ask those people to

71

O'LEARY

1

2  provide recommendations?

3       A.    I don't think I asked Judge, at

4  that time Sallie, Manzanet. I think Price

5  did speak for me.  I know Boyle did speak

6  for me, but I don't think I asked -- I

7  don't recall if I asked Boyle to speak for

8  me.

9       Q.    How long did you work for Judge

10  Ruiz?

11       A.    Three years.

12       Q.    When did you end your employment

13  with Judge Ruiz?

14       A.    Probably January of '03, if I

15  recall correctly.

16       Q.    What were the circumstances of

17  your leaving her employment?

18       A.    Judge Ruiz had been a supervisor

19  with the Legal Aid Society Criminal

20  Division.  Most of my time, virtually all

21  of my time in court attorney titles had

22  been on the criminal side.  She decided to

23  give the civil term a shot and ultimately

24  we agreed that the civil term was not

25  quite my cup of tea.  It was a hard

72

O'LEARY

1

2    learning curve, very steep learning curve.

3         Q.    So you started to work with her

4    when she went to the civil term?

5         A.    I started working with her when

6    she was on the criminal term.  Sometime

7    thereafter she decided that she wanted to

8    give the civil term a shot, they needed

9    the people, they were backlogged, the

10   criminal terms were declining and she

11   transferred from the criminal term to the

12   civil term.

13        Q.    How long did you continue

14   working for her after she transferred to

15   to the civil term?

16        A.    Probably a year and a half,

17   maybe a little more.

18        Q.    You said a hard learning curve

19   in the civil term. What do you mean?

20        A.    It was a different style of

21   work, it was a different volume of work,

22   something I was not overly familiar with.

23   The Judge herself was not as conversant

24   with it as others were, and it was very

25   difficult. At first, colleagues were

73

                    O'LEARY

1
2    helpful.
3        Q.    What sort of concepts were
4    difficult to you?
5        A.    Summary judgment motions,
6    threshold issues.
7        Q.    Anything else?
8        A.    Some of the procedural aspects
9    of the civil term were problematic for me.
10       Q.    Problematic in what sense?
11       A.    Sorry?
12       Q.    Problematic in what sense?
13       A.    I didn't understand the medical
14   terms, I didn't understand the impact of
15   certain things within motion practice,
16   which is basically what I was addressing.
17   We were doing jury charges. What would
18   flow for some who are more experienced in
19   it did not come that easily, and because
20   we each had a felony background, sometimes
21   it became sticky.
22       Q.    You mentioned also the volume
23   that was different in the civil term than
24   in the criminal term.  Is it more intense
25   volume of cases? Is that what you mean?

74

O'LEARY

1

2    A.    The motion practice is what I

3    was addressing.

4    Q.    So there was a greater volume of

5    motions to research and draft decisions

6    for?

7    A.    Oh, yes.

8    Q.    So you decided on your own to

9    leave the civil term and Judge Ruiz'

10   employ?

11   A.    No, Judge Ruiz and I decided we

12   would divorce.

13   Q.    You got a divorce from Judge

14   Ruiz?

15   A.    Yes.

16   Q.    Is that an amicable divorce?

17   A.    Much more so now.

18   Q.    Where did you go after that?

19   A.    I thought I had an arrangement

20   to go back to Criminal Court at the time,

21   that fell through and I ended you going

22   with Judge Nelson Roman, staying in the

23   Civil Term.

24   Q.    During the time on your resume,

25   Defendant's Exhibit 1, from 1988 to 2002,

75

O'LEARY

1 
2  did you ever work as a law clerk for any
3  other justice or acting justice that's not
4  listed on your resume there?
5      A.    I'm not sure.  For a judge or
6  justice?
7      Q.    Either a justice or an acting
8  justice.
9      A.    Okay.  I was not formally
10 assigned to any other person except those
11 that are listed.  Chambers was sometimes
12 work with another judge where there's
13 something that's -- as the need calls for
14 and as the personnel were comfortable.  I
15 did some work with Justice Price while I
16 was with Judge Ruiz while he was without a
17 court attorney or while he had a new court
18 attorney.
19     Q.    What time was that?  What dates,
20 if you recall?
21     A.    I have no recollection.
22     Q.    But you recall it was when you
23 were formally assigned to Judge Ruiz?
24     A.    I believe Judge Price became
25 sick initially when I was with Justice

76

O'LEARY

Bernheim and was either without a court

attorney or had an inexperienced court

attorney.

          At the end of my time with

Bernheim, I started my time with Ruiz, but

it was an interim type of thing pick up,

it was not a formal assignment.

     Q.     Did you seek that job or did

someone tell you you were assigned to it?

     A.     I still worked for the other

woman.

     Q.     I understand, but this job with

Justice Price, did you seek that job?

     A.     It was not a job, it was a

fill-in.  Judge Price would approach the

justice for whom I worked and asked if he

could lend me, do you think she could help

me out with this.  This was not a job with

Judge Price.

     Q.     Did you supervise anybody when

you worked with Judge Price?

     A.     Both with Judge Price and with

Judge Ruiz, they were active with the

intern program and the City of Schools

77

O'LEARY

program.  One time I think Price had six

or seven kids, I do mean young adults,

into their mid 20s, some high school, some

college, some law school, and Judge Ruiz

was also very active with those programs.

So at one point they started to call me

the Price Club, there were that many, and

yes.

Q.    What was your role with respect

to those students?

A.    Supervising them in terms of

assignment, work, coordinating with other

court attorneys throughout the criminal

term.  If I say outings, it gives you a

different perspective, but there were

tours, whether it was at Rikers Island.  At

one point I think they went to Sing Sing,

they did the central booking tours.  These

were ongoing activities for the summers

mostly, but not exclusively.

Q.    Did you ever perform written

evaluations on any of these?

A.    I wrote recommendations for some

of them, including bar recommendations,

O'LEARY

admissions recommendations for at least

one.

    Q.    By written evaluations, their

performance?

    A.    Not for retension within the

court system.

    Q.    I'm not sure what you mean.

    A.    I did not write recommendations

or evaluations of them in my role as a

court attorney for the court system.

    Q.    Other than recommendations that

you may have written, did you write any

evaluations of their performance or their

duties for any person or body to review?

In other words, they were interns, did you

write any kind of formal evaluation of

their performance for whatever group or

school or organization they came from?

    A.    I may have, but I don't recall.

    Q.    Any other supervisory experience

that you had with Judge Ruiz?

    A.    The same confidential that I

worked with with Judge Bernheim came to

Judge Ruiz for a short time.

126

O'LEARY

1

2    supervising other attorneys, is that

3    correct?

4              MR. COREN:  In court --

5              MR. SULLIVAN:  Anywhere in the

6    system.

7              MR. COREN:  Oh, that is a

8    different question.

9              MR. SULLIVAN:  That was the

10   original question.

11        A.    No.

12        Q.    Showing you what's been marked

13   as Defendant's Exhibit 4, I am going to

14   ask you to review it and state for the

15   record what it is?

16              (The witness reviews document.)

17        A.    This appears to be a copy of a

18   job announcement for Deputy Chief Clerk 5

19   within the Criminal Court, City of New

20   York, in December of 2002.

21        Q.    Just for the record, the

22   announcement number is 21209, correct?

23        A.    Correct.

24        Q.    Did you apply for this job in

25   December of 2002?

127

                         O'LEARY

1

2       A.      Yes, I did.

3       Q.      Did you get an interview for

4  this job?

5       A.      Yes, I did.

6       Q.      Drawing your attention to the

7  section labeled qualifications, would you

8  please describe for me what, at the time

9  you applied, what experience you possessed

10  involving human resources administration?

11      A.      None.

12              MR. SULLIVAN:  Let the record

13  reflect that counsel is conferring with

14  plaintiff.

15      Q.      Your answer is no, is that

16  correct?

17      A.      Human resources administration?

18      Q.      Yes.

19      A.      As I understand, it is a

20  particular function.  In terms of

21  administration, I have no formal

22  experience.

23      Q.      Would you please describe what

24  experience that you possessed at the time

25  you applied for this job regarding budget

143

O'LEARY

1  Chief Clerk position in December of 2002

2  sought by the plaintiff.

3              Have you had a chance to look at

4  that?

5      A.     Yes, sir.

6      Q.     Serena Springle was the person

7  that got that job as Deputy Chief Clerk,

8  is that correct?

9      A.     That's my understanding.

10     Q.     Do you feel you were more

11 qualified than Serena Springle for this

12 job?

13     A.     Yes, I do.

14     Q.     Why?

15     A.     Ms. Springle had spent a

16 significant amount of time in advance of

17 this appointment in the Civil Court.  At

18 that point, most of my experience had been

19 in the arena.  Her two years immediately

20 preceding the appointment, almost three

21 years, was in housing court, which is an

22 almost entirely different arena.  Her

23 resume says she has a bachelor's degree in

24 May of 2004, and posting date there is

144

O'LEARY

2002.  So I don't know that she had the

bachelors at the time of this posting.

    Q.    Is there any other reason you

believe you were more qualified than

Serena Springle for this job?

    A.    Within the criminal term, she

had passed the same number of Civil

Service tests as I had.  I believe my

background and education gave me more of

an edge.  I also had -- you can tell from

her resume what her start date was with

the system, but I had more time in the

system than she did.

    Q.    Anything else?

    A.    No.

    Q.    Ever been an Associate Court

Clerk, have you?

    A.    No.

    Q.    You never served as an Associate

Court Clerk?

    A.    That's correct.

    Q.    You never carried out the duty

of Municipal Court Clerk, have you?

    A.    That's correct.

**From:**      Frances O'Leary
**To:**        William Etheridge
**Date:**      Mon, Dec 30, 2002 10:26 AM
**Subject:**   Deputy Chief Clerk

I'm sorry that I can't get there to drop this in person.

Please accept this resume in the stead of the short form one previously sent.

Looking forward to the interview. I'll have a completed USC form with me then. Thanks.

## Serena Springle
119-52 Nashville Boulevard
St. Albans, New York 11412
Home (718) 341-1138
Work (212) 374-6249


**COURT EXPERIENCE:**

**CIVIL COURT OF THE CITY OF NEW YORK**
Housing Part: New York County
**Principal Court Clerk:** March 2000 - Present
- Responsible for the supervision of all non judicial personnel and daily court operations;
- Preparation of employee schedules, time/leave, and evaluations;
- Participation in employee hiring panels;
- Representation of Housing Court as Instructor in Civil Court's new employee orientation program, as well as designed and implemented new training materials for Housing Court employees;
- Primary liaison to Resource Center for self-represented litigants;
- Assist the Supervising Judge of the Housing Court with calendar management of the Resolution Parts;
- Review court statistics and manage case processing throughout the various parts of the Housing Court;
- Provide information and assistance to Judges of the Housing and Civil Courts, nonjudicial personnel, litigants, members of the bar, the press and the general public.


**SUPREME COURT OF THE STATE OF NEW YORK**
Criminal Term: New York County
**Associate Court Clerk:** March 1997 - March 2000
- Supervision of Supreme Court Clerk's Office;
- Appropriation of staff to Court parts;
- Preparation and arrangement for training of new clerks;
- Maintenance of court records;
- Provided assistance and information to judges, attorneys, litigants, the press and to the general public.


**Honorable Juanita Bing Newton, Administrative Judge**
Criminal Term: New York County
**Senior Court Clerk/Associate Court Clerk:** July 1995 - July 1999
- Preparation of case activity reports;
- Coordination of matrimonial enforcement part;
- Preparation of intake sheets;
- Indexed law journal cases;
- Maintain court records.

**Senior Court Clerk:** February 1993 to March 1997
- Supervision of court personnel;
- Maintain court minutes;
- Maintenance of court records;
- Maintain custody of court exhibits;
- Swore in witnesses, polled jurors;
- Selection of Grand Juries.

**Senior Court Officer,** September 1989 - February 1993

**CIVIL COURT OF THE CITY OF NEW YORK**
New York County
**Court Officer:** February, 1985 to September, 1989

**OTHER EXPERIENCE:**

Capital Awning, 1980 -1985
Full Charge Bookkeeper

Drescher, Dorkin & Kaplan, CPA,
Accounts receivable and accounts payable.

**EDUCATION:**

City College, City of New York
Major: Public Administration
Degree:  Bachelor of Arts
May, 2004

International Career Institute, New York, New York
Certificate in Bookkeeping

REFERENCES AVAILABLE UPON REQUEST

# SURROGATE'S COURT
### BRONX COUNTY - STATE OF NEW YORK
851 GRAND CONCOURSE
BRONX, NEW YORK 10451

LEE L. HOLZMAN
JUDGE



MICHAEL L. PRISCO
CHIEF CLERK

EARNESTINE GLOVER
DEPUTY CHIEF CLERK

December 8, 2005

**M E M O R A N D U M:**

**TO:**        Hon. Joan B. Carey

**FROM:**    Hon. Lee L. Holzman
             Surrogate

**SUBJECT:**    <u>Chief Clerk VI</u>


**Attached you will find all necessary papers pertaining to the above mentioned position.**

   **1)**    **Original Employment Announcement (UCS-23)**

   **2)**    **Original Interview Summary Sheets (UCS-24) with names of candidates
            in order of preference:**

       **#1  Diana M. Cruz**
       **#2  John Raniolo**
       **#3  Earnestine Glover**

   **3)**    **Original Interview Data Sheets (UCS-19xi)**

   **4)**    **Statement of Recruitment and Hiring Efforts (UCS-24A)**


**Should you require additional information, please feel free to contact our office at
(718) 590-4515.**